**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-12-00295-CV**
_____

**IN THE ESTATE OF ROGER DALE RICE**

**On Appeal from the County Court**
**San Jacinto County, Texas**
**Trial Cause No. P11-74**

**MEMORANDUM OPINION**

This is an appeal of the trial court's judgment and orders in an heirship proceeding. In six appellate issues, appellant Vickey Rice ("Vickey") challenges the trial court's final judgment determining and declaring heirship, the trial court's order denying her the status of putative spouse, and the sufficiency of the evidence supporting the trial court's findings of fact and conclusions of law. We affirm the trial court's judgment and order, and find that legally and factually sufficient evidence supports the trial court's findings of fact and conclusions of law.

1

BACKGROUND

Vickey filed an application to determine heirship after the death of Roger Dale Rice. Vickey contended in the application that she was the decedent's wife and was therefore entitled to share his estate with his two children. Vickey also contended the decedent was previously married, and the marriage terminated "[p]rior to December 31, 2004[,] based on information and belief[.]" Vickey alleged in the alternative that "if the Court were to find any legal impediment to the marriage between Roger Dale Rice and Vickey Rice, that Vickey Rice would then be the innocent good faith, 'putative spouse' of Roger Dale Rice." Vickey also filed an application for independent administration and for letters of administration, in which she contended that administration of the estate was necessary due to pending wrongful death litigation concerning the events that led to the decedent's death. The trial court appointed an attorney ad litem to represent unknown heirs and heirs with a legal disability.

Appellee Kathryn Rice ("Kathryn") filed an objection to Vickey's application for determination of heirship and counter-applied for determination and declaration of heirship. Kathryn argued in her objection to Vickey's application that she is the decedent's surviving spouse. Kathryn also filed an application for appointment as independent administratrix, in which she alleged administration

2

was necessary due to outstanding debts of the estate and "a survival action claim." Attached to Kathryn's original application were certified copies of a marriage license that indicated Kathryn married decedent on February 14, 1990, an order dismissing a divorce action between Kathryn and the decedent for want of prosecution on December 11, 2000, and an order dismissing a divorce proceeding between Kathryn and the decedent on December 13, 2006.

Vickey later filed an answer and objection to Kathryn's amended application, in which she contended Kathryn failed to establish a continuing marriage between Kathryn and decedent "so as to overcome the presumption in favor of the more recent marriage between Vickey Rice and Roger Rice[,]" and that Vickey was the decedent's "innocent putative spouse."

The trial court conducted an evidentiary hearing on the competing applications for heirship. Vickey testified that she first met the decedent when he was working at Houston Cycle Salvage, where she had taken her motorcycle. The decedent invited her to lunch, and they began a romantic relationship. Vickey testified that she and the decedent discussed their past relationships, and decedent told her he had been alone for some time, but she and the decedent did not discuss the dates of their divorces. Vickey explained, "no one ever said I got divorced on this specific day. It was just almost . . . assumed, if you were by yourself and

you've been by yourself, you have an apartment . . . ." According to Vickey, the decedent referred to Kathryn as his "ex-wife[.]" Vickey testified that she believed the decedent's references to Kathryn as his "ex" meant that the decedent and Kathryn were divorced.

Vickey testified that she and the decedent discussed marriage after a few months of seriously dating, and they had planned to wed in June 2005, but they selected an earlier wedding date after decedent sustained a severe head injury in January 2005. Because the decedent did not have health insurance, Vickey and the decedent moved up the marriage date to obtain health insurance and medical treatment for the decedent. Vickey testified that she and the decedent married in a ceremony on February 18, 2005, after obtaining a marriage license, and the trial court admitted a certified copy of the marriage license into evidence. Vickey testified that she and the decedent wore their wedding rings in Kathryn's presence, and Kathryn never questioned them about the rings and never suggested that she was still married to the decedent. According to Vickey, she had no reason to believe the decedent was still married to Kathryn, and she believed her marriage to the decedent was valid. Vickey testified that the decedent never said he had not divorced Kathryn.

Vickey lived with the decedent until his death. Vickey testified that during the marriage, she and the decedent lived in Harris, Fort Bend, and San Jacinto counties. Vickey explained that after the decedent's injury, he was unable to return to work, and she cared for the decedent and provided for him. According to Vickey, decedent collected social security disability benefits after his head injury, and the benefits were sent to "Vickey Rice for Roger Dale Rice." Vickey testified that the only legal actions involving decedent of which she was aware during their marriage were a CPS case and issues involving child custody and visitation. According to Vickey, the decedent paid child support from his social security disability benefits after CPS ordered him to do so. Vickey explained that she and the decedent held themselves out as married, and the decedent referred to Vickey as his wife and she referred to the decedent as her husband. Vickey testified that Kathryn never indicated she was still married to the decedent until a wrongful death lawsuit was filed.

On cross-examination, Vickey testified that she never saw a divorce decree ending the marriage between the decedent and Kathryn, nor did she ever see a schedule for visitation between the decedent and his two children. The trial court admitted a certified copy of a status conference requested by the decedent on October 6, 2004, in a legal proceeding. Vickey testified that she believed the

5

proceeding only concerned the CPS case, and was unaware that the decedent was discussing a divorce with his attorney or that she was mentioned by name in the decedent's divorce petition. Vickey testified that she did not recall having a 2004 conversation with Kathryn about desiring for Kathryn and the decedent to divorce.

Donald Marrs testified that he knew the decedent for over thirty years, and he knew the decedent had been previously married and had two children from that marriage. According to Marrs, the decedent subsequently introduced Vickey as his wife, and the decedent referred to Kathryn as his ex. On cross-examination, Marrs testified that he never saw a divorce decree between the decedent and Kathryn. Marrs explained that prior to the trial, he had not met Kathryn.

Brenda Byer testified that she knew the decedent for thirty-three or thirty-four years. Byer testified she has met Kathryn, and Byer knew Kathryn and decedent were once married and had two children. Byer explained that sometime in 2008, she became aware that the decedent had married Vickey. Byers testified that the decedent told her he had divorced Kathryn, and the decedent referred to Vickey as his wife. On cross-examination, Byer testified that she never saw a divorce decree between Kathryn and the decedent. Byer testified that she never saw or spoke to Kathryn after 2003.

Kathryn testified that she married the decedent on February 14, 1990, and they had two children together. Kathryn explained that the decedent moved out of their house in 2004, and she explained that they had separated "[a] few times" before 2004. Kathryn denied holding herself out as being married to any other person since her separation from the decedent. Kathryn testified that she saw the decedent at various CPS proceedings after their separation. Kathryn testified that she was unaware that the decedent and Vickey had married until Vickey's attorney contacted her by phone before the decedent's funeral. Kathryn explained that she sometimes indicated on documents that she was single because "they don't list separated a lot of times.  It's either married or single." Kathryn denied telling people she was single, and she denied filing her tax returns as a single person and explained that she instead filed as head of household. Kathryn testified that between 2005 and 2011, she told her best friend that she was married to the decedent. Kathryn admitted that during her deposition, she testified that she only told family members that she remained married to the decedent.

Kathryn denied holding herself out as single on a Facebook page, and she denied knowing who created the Facebook page. Kathryn testified that she did not know how the relationship status on the Facebook page changed from "single" to "widowed" the day after her deposition. According to Kathryn, she has lived in

7

Galveston County and San Jacinto County since 1990. Kathryn testified that she did not help the decedent obtain medical treatment because she did not know that he needed help. According to Kathryn, the decedent "had to have known there was no divorce decree because there were no papers that were final papers that were served." Vickey's counsel rested at the conclusion of Kathryn's testimony.

Kathryn's aunt, Florence Zuniga, testified that she knew the decedent, and that the decedent was still her nephew on the date of his death. She testified that she saw him occasionally, but she had not seen him since he and Kathryn separated. Florence explained that she had never seen a divorce decree, and Kathryn never told her that Kathryn and the decedent divorced. Florence testified that Kathryn told her that she and the decedent were separated, but they never divorced. Florence testified that she was told Vickey had married the decedent. According to Florence, prior to the decedent's death, she had never heard the name "Vickey" from the decedent's children, and the children never referred to Vickey as their stepmother. Florence testified that Kathryn had referred to herself as single, but she was unaware of Kathryn having any relationships since her relationship with the decedent.

Kathryn's uncle, Ernest Zuniga, testified that Kathryn and the decedent were married. When asked whether he believed the decedent was married to Kathryn at

8

the time of his death, Ernest responded, "I think he was because as far as I know they never got divorced." Ernest testified that Vickey was the decedent's wife, but opined that the decedent was not divorced from Kathryn. Ernest testified that Kathryn and the decedent were separated. On cross-examination, Ernest explained that he simply knew Kathryn and the decedent were no longer together. Ernest explained that the information he had concerning Kathryn and the decedent still being married came from Kathryn's mother. Vickey's counsel objected to Ernest's testimony on the basis of hearsay, and the trial court overruled the objection and stated that the objection was "a little untimely" because "he's already answered all the questions."

Kathryn Smith, Kathryn's mother, testified that she did not see Vickey during the CPS proceedings concerning the children, and she could not recall the first time she heard Vickey's name. Smith explained that Kathryn and the decedent were married at the time of his death because they never got a divorce, and Kathryn "never did get the papers." Smith testified that Kathryn and the decedent had both filed divorce proceedings, but neither proceeding resulted in a divorce. Smith explained that a pending divorce case between Kathryn and the decedent was dismissed between 2004 and 2006. Kathryn told Smith the divorce was dismissed and "they reconciled." Smith explained that prior to the decedent's

death, she learned from Kathryn that Vickey and the decedent had married. On cross-examination, Smith explained that her daughter had "moved on" from the decedent and had represented herself in the community as having "moved on."

Kathryn's counsel offered into evidence a certificate of "no records found" by the Galveston County Clerk. Vickey's counsel objected on the basis of improper predicate and lack of foundation as a business records affidavit. The trial court overruled the objection and admitted the document into evidence. In addition, Kathryn's counsel offered into evidence certificates of "no records found" by the Liberty County Clerk, the Montgomery County Clerk, the Polk County Clerk, the San Jacinto County Clerk, the Trinity County Clerk, and the Walker County Clerk, and Vickey's counsel also objected to these certificates. The trial court overruled the objection and admitted the documents into evidence. The trial court declined to admit into evidence a purported certificate from the Harris County District Clerk's office verifying the lack of records concerning proceedings between decedent and Kathryn because the certificate was incorrectly worded and dated.

Kathryn's counsel offered into evidence a certified copy of a dismissal from Galveston County Court at Law No. 2, dated November 30, 2000, of a proceeding captioned "Kathryn Rice v. Roger Dale Rice[.]" Vickey's counsel did not object, and the trial court admitted the document into evidence. Finally, Kathryn's counsel

offered into evidence an order of dismissal in a divorce proceeding between decedent and Kathryn, dated December 13, 2006, and the trial court admitted it into evidence without objection.

Kathryn returned to the stand to testify on her own behalf. Kathryn identified a certified copy of the marriage license, dated February 9, 1990, issued to her and the decedent. Kathryn testified that she does not have a divorce decree from the decedent, but she does have divorce decrees ending her two marriages that were prior to her marriage to decedent. When asked to tell the judge every county where she had resided, Kathryn testified that she was born in Galveston County, moved to San Jacinto County, and then returned to Galveston County. According to Kathryn, she filed for divorce from the decedent in 2000, and the case was dismissed. Kathryn explained that the decedent filed for divorce in 2004, but that proceeding was dismissed. Kathryn testified that she first met Vickey when the decedent brought her with him to Kathryn's house and introduced her to Kathryn as his girlfriend.

Kathryn testified that on one occasion during the CPS proceedings in 2004, she rode home with the decedent and Vickey. Kathryn testified that during the ride home, "Vickey spoke to me and Roger and asked if we wouldn't mind going ahead and getting a divorce, I knew that's what she was speaking about, so they could go

11

ahead and get on with their lives." Kathryn testified that she believed Vickey knew the decedent was still married. Kathryn stated that she was served with divorce papers within a month after the conversation took place. Kathryn testified that until the decedent's death, she believed Vickey was the decedent's girlfriend. According to Kathryn, Vickey's attorney called her on the telephone and said he could produce a marriage license between Vickey and the decedent, but he was not sure that the decedent and Kathryn were divorced. Kathryn testified that Vickey's attorney asked if he could represent her children, and he asked her to keep quiet about the lack of divorce records. Kathryn eventually retained her own counsel. Kathryn testified that the decedent was still married to her at the time of his death, regardless of whether he also married Vickey. Kathryn explained that she wanted the trial court to rule that her marriage to the decedent is valid and Vickey's is void because Kathryn is "looking out for [her] children for their best interest."

The attorney ad litem testified that she did her own telephone and internet research concerning counties where a divorce decree might have been entered, including Harris, Fort Bend, San Jacinto, and Galveston counties, and found no divorce records. Vickey's counsel objected to the ad litem's testimony on the grounds that it constituted hearsay. The trial judge overruled the objection and allowed the ad litem's testimony.

12

At the conclusion of the hearing, the trial judge orally found that the marriage between the decedent and Kathryn was valid, and he made "no finding of good faith as to putative marriage of . . . Vickey Rice." The trial judge found that the decedent died intestate, had two children, and appointed Kathryn as dependent administratrix of decedent's estate. The trial judge signed a final judgment determining and declaring heirship, in which he found that decedent was married to Kathryn at the time of his death, and Kathryn is decedent's only legal wife because decedent attempted to marry Vickey while still married to Kathryn, making the purported marriage to Vickey invalid.

At Vickey's request, the trial judge made written findings of fact and conclusions of law. In his findings and conclusions, the trial court found the following, in pertinent part: (1) the decedent and Kathryn legally married on February 14, 1990; (2) Kathryn filed for divorce, but the proceeding was dismissed for want of prosecution on December 11, 2000; (3) between 1990 and 2005, the decedent resided in San Jacinto, Fort Bend, Harris, and Galveston counties, and Kathryn resided in San Jacinto and Galveston counties; (4) no decree of divorce between Kathryn and the decedent was found of record in Galveston, Harris, Liberty, Montgomery, Polk, San Jacinto, Trinity, Walker, or Fort Bend counties; (5) decedent filed for divorce in Galveston county, but the proceeding was

13

dismissed for want of prosecution on December 13, 2006; (6) decedent and Vickey purportedly were married on February 18, 2005; (7) Kathryn was still legally married to decedent at the time of his death and is decedent's surviving spouse; (8) the purported marriage between decedent and Vickey was "not a legal marriage[;]" and (9) Vickey did not enter into a putative marriage with decedent in good faith and is not decedent's putative spouse. Four days later, the trial court signed a separate "order denying putative spouse[,]" in which he found Vickey had not acted in good faith and therefore was not the putative spouse of the decedent, determined that Kathryn is the decedent's sole surviving spouse, and found that Vickey was not entitled to any inheritance from the estate. Vickey filed a motion for reconsideration, which the trial judge denied. This appeal followed.

## VICKEY'S ISSUES

In issue one, Vickey contends the trial court erred in its final judgment determining and declaring heirship. In issue two, Vickey argues the trial court's final judgment determining and declaring heirship was not supported by legally and factually sufficient evidence. Vickey asserts in issue three that the trial court erred in its order denying her putative spouse status. In issue four, Vickey maintains that the evidence was legally and factually insufficient to support the trial court's order denying her putative spouse status. In issue five, Vickey argues

14

the trial court erred in denying her motion to reconsider. In issue six, Vickey argues that the trial court's findings of fact and conclusions of law were not supported by legally and factually sufficient evidence. Within her arguments, Vickey complains that the trial court abused its discretion by admitting certificates of "no records found" into evidence and allowing the admission of hearsay evidence during the testimony of the ad litem and Ernest. We address Vickey's issues together.

STANDARDS OF REVIEW AND APPLICABLE LAW

Findings of fact in a bench trial have the same force and dignity as a jury's verdict. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). "We apply the same standards in reviewing the legal and factual sufficiency of the evidence supporting the trial court's fact findings as we do when reviewing the legal and factual sufficiency of the evidence supporting a jury's answer to a jury question." *Rich v. Olah*, 274 S.W.3d 878, 883 (Tex. App.—Dallas 2008, no pet.). In reviewing the legal sufficiency of the evidence, we review the evidence in the light most favorable to the trial court's findings, crediting evidence favorable to that party if a reasonable fact finder could, and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). The challenging party will prevail on a "no evidence" issue if the

15

record shows (1) there is no evidence supporting a vital fact, (2) the evidence offered to prove a vital fact is no more than a mere scintilla, (3) the evidence conclusively establishes the opposite of a vital fact, or (4) the court is barred by law or the rules of evidence from considering the only evidence offered to prove a vital fact. *Id.* at 810 (quoting Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error,* 38 Tex. L. Rev. 361, 362-63 (1960)).

More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, would enable reasonable and fair-minded people to differ in their conclusions. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). If the evidence is so weak that it does no more than create a mere surmise or suspicion of its existence, it is no evidence. *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 182 (Tex. 1995). Evidence conclusively establishes a vital fact when the evidence is such that reasonable people could not disagree in their conclusions. *City of Keller*, 168 S.W.3d at 814-17.

In reviewing the factual sufficiency of the evidence, we weigh all of the evidence and will set aside the judgment only if it is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.* at 826; *see also Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). To set aside the judgment on factual sufficiency grounds, we must be able to detail the evidence relevant to

16

the particular issue and then state how the contrary evidence greatly outweighs the evidence that supports the judgment. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam).

In a bench trial, the trial court acts as the fact finder, is the sole judge of the weight and credibility of the witnesses and evidence, and is entitled to resolve any conflicts in the evidence and to choose which testimony and witnesses to believe. *City of Keller*, 168 S.W.3d at 819*; see also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *HTS Servs., Inc. v. Hallwood Realty Partners, L.P.*, 190 S.W.3d 108, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.). The fact finder may choose to believe one witness over another, and we may not substitute our judgment for that of the fact finder. *Golden Eagle Archery*, 116 S.W.3d at 761; *Figueroa v. Davis*, 318 S.W.3d 53, 60 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

"We review a trial court's evidentiary rulings for abuse of discretion." *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000). Error may not be predicated upon a ruling which admits evidence unless the party's substantial rights are affected. Tex. R. Evid. 103(a). We will not reverse a judgment based on an error of law unless that error probably caused the rendition

17

of an improper judgment or probably prevented appellant from properly presenting the case to the appellate court. Tex. R. App. P. 44.1(a).

A presumption of validity applies to every marriage entered into in Texas. Tex. Fam. Code Ann. § 1.101 (West 2006). "When two or more marriages of a person to different spouses are alleged, the most recent marriage is presumed to be valid as against each marriage that precedes the most recent marriage until one who asserts the validity of a prior marriage proves the validity of the prior marriage." *Id.* § 1.102 (West 2006). "This presumption is one of the strongest known to law; it is, in itself, evidence; and it 'may even outweigh positive evidence to the contrary.'" *Nguyen v. Nguyen*, 355 S.W.3d 82, 89 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (*quoting In re Estate of Loveless*, 64 S.W.3d 564, 574 (Tex. App.—Texarkana 2001, no pet.)); *see also Tex. Emp'rs Ins. Ass'n v. Elder*, 155 Tex. 27, 282 S.W.2d 371, 373 (1955).

When the validity of the most recent marriage is challenged on the basis of the existence of a prior marriage, the burden of proof is on the party challenging the most recent marriage to demonstrate (1) that a prior marriage is an impediment and (2) the continuing validity of the prior marriage. *Nguyen*, 355 S.W.3d at 89 (quoting *Loveless*, 64 S.W.3d at 574).

> To rebut the presumption, the proponent of the earlier marriage must prove that (1) the first spouse was alive at the time the husband

18

> married the second wife; (2) the husband never secured a divorce or annulment from the first wife; and (3) the first wife never secured a divorce or annulment from the husband.

*Id.* (citing *Medrano v. State*, 701 S.W.2d 337, 341 (Tex. App.—El Paso 1985, pet. ref'd)). The presumption that the most recent marriage is valid may be rebutted only by evidence that negates every possible method by which the prior marriage could have been dissolved. *Schacht v. Schacht*, 435 S.W.2d 197, 201 (Tex. Civ. App.—Dallas 1968, no pet.); *Simpson v. Simpson*, 380 S.W.2d 855, 858 (Tex. Civ. App.—Dallas 1964, writ ref'd n.r.e.). However, evidence rebutting the validity of the more recent marriage "need not be established absolutely or to a moral certainty," and the weight of the evidence is a question for the fact finder. *Schacht*, 435 S.W.2d at 201; *Simpson*, 380 S.W.2d at 858. The proponent of the validity of the first marriage need not "prove the nonexistence of divorce in every jurisdiction where proceedings could have been possible; it is only necessary to rule out those proceedings where [the proponent's spouse] might reasonably have been expected to have pursued them." *Davis v. Davis*, 521 S.W.2d 603, 605 (Tex. 1975).

A person who is currently married cannot legally obtain a marriage license to marry someone else. *See* Tex. Fam. Code Ann. § 2.009(a)(5), (b) (West Supp. 2012); *see also id*. § 6.202(a) (West 2006) (A marriage is void if "either party has an existing marriage to another person that has not been dissolved by legal action

19

or terminated by the death of the other spouse."). A putative marriage is a marriage that is entered into in good faith by one of the parties, but that is invalid because of some legal impediment. *Osuna v. Quintana*, 993 S.W.2d 201, 210 (Tex. App.—Corpus Christi 1999, no pet.). The law protects the innocent spouse who acted in good faith by giving the innocent spouse most of the lawful rights she would have had during the putative relationship.[1] *Davis*, 521 S.W.2d at 606. To prove a putative marriage, a party must demonstrate that she entered into the purported marriage in good faith and without knowledge of the legal impediment to the marriage. *Garduno v. Garduno*, 760 S.W.2d 735, 738 (Tex. App.—Corpus Christi 1988, no writ); *Esparza v. Esparza*, 382 S.W.2d 162, 167 (Tex. Civ. App.—Corpus Christi 1964, no writ).

## ANALYSIS

As previously discussed, Vickey challenges the trial court's evidentiary rulings with respect to the certificates of no divorce records found, Ernest's testimony that he believed Kathryn and the decedent never divorced, and the ad litem's testimony concerning her efforts to ascertain whether divorce records existed in Galveston, Harris, San Jacinto, and Fort Bend counties. Specifically,

---

[1]We are aware that one of the lawful rights not afforded to a putative spouse is the right to bring a wrongful death action. *Tex. Emp'rs Ins. Ass'n v. Grimes,* 153 Tex. 357, 269 S.W.2d 332, 335 (1954).

20

Vickey argues that the certificates of no divorce records were incomplete, defective, of no evidentiary value, and did not comply with Rules 803(10) and 902 of the Texas Rules of Evidence, and she contends that the trial court erroneously admitted hearsay evidence during the testimony of the guardian ad litem and Ernest. *See* Tex. R. Evid. 803(10), 902.

With respect to Ernest's testimony, Vickey's counsel did not lodge his hearsay objection until the conclusion of Ernest's testimony on direct examination. However, even assuming without deciding that counsel timely objected to Ernest's testimony, Kathryn and two other family members offered the same testimony as Ernest concerning a continuing marriage between Kathryn and the decedent. Therefore, Vickey has not demonstrated that the admission of Ernest's testimony affected her substantial rights, probably caused the rendition of an improper judgment, or probably prevented her from properly presenting her case to this Court. *See* Tex. R. Evid. 103(a); Tex. R. App. P. 44.1(a). Similarly, with respect to the testimony of the guardian ad litem concerning the lack of divorce proceedings in Galveston, San Jacinto, Harris, and Fort Bend counties, Vickey has not demonstrated that the admission of the guardian ad litem's testimony affected her substantial rights, probably caused the rendition of an improper judgment, or probably prevented her from properly presenting her case to this Court, since other

21

evidence of the lack of any final divorce proceedings was before the trial judge from the testimony of Kathryn, Florence, and Smith. *See* Tex. R. Evid. 103(a); Tex. R. App. P. 44.1(a).

We now turn to the certificates from various counties purportedly verifying the lack of final divorce proceedings between Kathryn and the decedent. Rule 803(6) of the Texas Rules of Evidence provides that a report or data compilation in any form made by a person with knowledge and if kept in the course of regularly conducted business activity is not excluded by the hearsay rule. Tex. R. Evid. 803(6). The hearsay rule also does not exclude:

> [e]vidence that a matter is not included in the memoranda, reports, records, or data compilations . . . kept in accordance with the provisions of paragraph (6), to prove the nonoccurrence or nonexistence of the matter, if the matter was of a kind of which a memorandum, report, record, or data compilation was regularly made and preserved . . . .

Tex. R. Evid. 803(7). Vickey complains that the certificates did not comply with Rule 803(10) of the Texas Rules of Evidence, which exempts the following documents from the hearsay rule:

> [t]o prove the absence of a record, report, statement, or data compilation, in any form, or the nonoccurrence or nonexistence of a matter of which a record, report, statement, or data compilation, in any form, was regularly made and preserved by a public office or agency, evidence in the form of a certification in accordance with Rule 902, or testimony, that diligent search failed to disclose the record, report statement, or data compilation, or entry.

22

Tex. R. Evid. 803(10). Vickey cited no case law in support of her contention that the certificates are defective. The certificates admitted by the trial court into evidence were signed and certified by the clerk or a deputy clerk. However, assuming without deciding that one or more of the certificates were defective or were irrelevant because they came from a county where decedent never resided, the trial judge also had before him testimony from Kathryn and other witnesses concerning the lack of a divorce between Kathryn and the decedent, as well as certified copies of two divorce proceedings between the decedent and Kathryn that were dismissed. Vickey has not demonstrated that the admission of the certificates into evidence affected her substantial rights, probably caused the rendition of an improper judgment, or probably prevented her from properly presenting her case to this Court. *See* Tex. R. Evid. 103(a); Tex. R. App. P. 44.1(a).

We turn now to Vickey's arguments concerning the legal and factual sufficiency of the evidence supporting the trial court's judgment, order denying putative spouse, and findings of facts and conclusions of law. The trial judge heard evidence from Vickey that when she met the decedent, they discussed their past relationships, but did not discuss the dates of their respective divorces. Instead, Vickey testified that she assumed decedent was divorced because he had been alone for a period of time, and the decedent referred to Kathryn as his "ex" or "ex-

wife." Vickey testified that she believed she had no reason to believe the decedent was still married to Kathryn, and she believed her marriage to the decedent was valid. Vickey and the decedent purportedly married on February 18, 2005. Vickey explained that she and the decedent held themselves out as married, the decedent referred to Vickey as his wife, and Vickey referred to the decedent as her husband. Byer testified that the decedent told her he had divorced Kathryn, and the decedent referred to Vickey as his wife. Marrs testified that the decedent referred to Kathryn as his ex and Vickey as his wife.

The trial judge also heard evidence from three of Kathryn's family members that Kathryn had never told them she and decedent were divorced, but Kathryn had instead indicated that she and the decedent were separated, and the family members believed no divorce decree had been entered. Kathryn testified that she does not have a divorce decree ending her marriage to decedent. Kathryn explained that she had filed a petition for divorce in 2000, and decedent had petitioned for divorce in 2004, but both proceedings were dismissed. Kathryn testified that final divorce papers were never served. Kathryn also testified that in 2004, Vickey asked Kathryn and the decedent to obtain a divorce so Vickey and decedent could get on with their lives, and the decedent filed for divorce within one month after

24

the conversation. Kathryn testified that after the decedent's death, Vickey's attorney asked Kathryn to keep quiet about the lack of a divorce decree.

Viewing all the evidence in the light most favorable to the jury's verdict, we conclude that the trial court's judgment, order denying putative spouse, and findings of fact and conclusions of law were supported by legally sufficient evidence. *See City of Keller*, 168 S.W.3d at 827. More than a scintilla of evidence supports the adverse finding concerning Kathryn's status as surviving spouse, the evidence did not conclusively establish the opposite of the finding or that Vickey was a good faith putative spouse, and the trial court was not barred from considering the only evidence offered to prove a vital fact. *See id.* at 810. Reasonable and fair-minded people could differ in their conclusions. *See Havner*, 953 S.W.2d at 711; *see also City of Keller*, 168 S.W.3d at 814-17. Likewise, reasonable minds could differ concerning whether Vickey married the decedent in good faith without knowledge of any legal impediment to their marriage. *See Havner*, 953 S.W.2d at 711; *City of Keller*, 168 S.W.3d at 814-817. The evidence did not conclusively establish Vickey's claim that she married the decedent in good faith and should be afforded putative spouse status. *See City of Keller*, 168 S.W.3d at 814-17.

In addition, weighing all of the evidence, the final judgment, order denying putative spouse status, and findings of fact and conclusions of law were not so against the great weight and preponderance of the evidence that they are clearly wrong and unjust. *See id*. at 826; *Cain*, 709 S.W.2d at 176. Because the evidence was conflicting, the trial court, in its role as fact finder, was entitled to resolve the conflicts and to choose which testimony to believe. *See City of Keller*, 168 S.W.3d at 819; *Golden Eagle Archery*, 116 S.W.3d at 761; *Figueroa*, 318 S.W.3d at 60. The evidence was legally and factually sufficient to support the trial court's judgment, order denying putative spouse, and findings of fact and conclusions of law. *See* Tex. Fam. Code Ann. §§ 1.102, 2.009(a)(5); *Nguyen*, 355 S.W.3d at 89; *Osuna*, 993 S.W.2d at 210. For all of the reasons discussed above, we overrule each of Vickey's six issues and affirm the trial court's judgment and order.

AFFIRMED.

_____
STEVE McKEITHEN
Chief Justice

Submitted on May 16, 2013
Opinion Delivered June 13, 2013
Before McKeithen, C.J., Gaultney and Horton, JJ.

26